**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**
**Criminal No. 19-50(1) (ADM/TNL)**

_____

United States of America,

                Plaintiff,          **DEFENDANT'S MEMORANDUM**
                                  **IN SUPPORT OF**
vs.                                **PRETRIAL MOTIONS**

Johntez Leondis Randle,

                Defendant.

_____

Johntez Randle, by and through counsel, has moved the Court to suppress evidence derived as a result of search warrants executed on a home in Brooklyn Park, a 2008 Audi Q7, and Mr. Randle's person, because the affidavit supporting those warrants was so lacking in probable cause that no reasonable officer could rely on it in good faith. (ECF Doc. 21.) He has further moved for a hearing under _Franks v. Delaware_, 438 U.S. 154 (1978), because the affidavit supporting the search warrants knowingly or recklessly contained misrepresentations of material facts that misled the reviewing magistrate into approving the warrants. (ECF Doc. 22.) Mr. Randle has also moved the Court for supplemental discovery related to his _Franks_ challenge. (ECF Doc. 39, 66.)

A hearing was held on these motions on October 29, 2019, where the government presented the testimony of Off. Efrem Hamilton. Based on that testimony, and upon all the files and records in this case, Mr. Randle now offers the following:

# ARGUMENT

### I.  THE SEARCH WARRANT AFFIDAVIT WAS SO LACKING IN PROBABLE CAUSE THAT NO REASONABLE OFFICER COULD RELY ON IT IN GOOD FAITH.

#### A.  The affidavit failed to present probable cause to search.

On January 30, 2019, Minneapolis Police Officer Efrem Hamilton drafted an application and affidavit for a search warrant, later presenting both to a Hennepin County District Court Judge for review and signature. (*See* Govt Ex. 1.) The application sought judicial approval for a police search of a home in Brooklyn Park, on Vera Cruz Lane. The police requested to search the home for evidence of drug dealing, packaging equipment, records, money, cell phones, firearms, and video surveillance equipment.

In his affidavit submitted to the reviewing judge, the officer explained that police were in contact with a confidential reliable informant ("CRI"). The affidavit explained that police received information from the CRI that "a male" was selling crack cocaine in and around the city of Minneapolis. Officer Hamilton positively identified the male as Johntez Randle after using "various investigative techniques." The officer did not specify what investigative techniques were actually used.

The affidavit further detailed that, at the instruction of the police, the CRI had initiated a purchase of illegal drugs from Mr. Randle, who was accompanied by an unidentified driver. It then explained that, after purchasing the illegal drugs, the CRI was shown a color photo of Mr. Randle, and confirmed that Mr. Randle was the person from whom the drugs were purchased.

Missing from the affidavit, however, was any information about a specific (or even generalized) location of where the transaction occurred. The document did not mention anything about where the CRI made the claimed purchase, only that Mr. Randle arrived to the unspecified location in a silver 2008 Audi Q7 Sports Utility Vehicle. Moreover, other than the claim that the purchase took place "within the past 72 hours," Officer Hamilton made no reference to exactly when the transaction allegedly occurred. The affidavit did not indicate where the alleged drugs were stored or where the cash proceeds were kept. In short, there is no information linking the suspected contraband to any physical location.

Instead, the affidavit application sought to search the home on Vera Cruz Lane by merely suggesting that Mr. Randle lived there. Notably, this attempt is made by way of two conclusory sentences that contain no evidence of corroboration or reliability for their conclusions. The affidavit stated that Mr. Randle is on U.S. Probation and has 9947 Vera Cruz Lane "listed" as his reported address until 2021. It did not indicate that police ever saw Mr. Randle enter or exit his home, and it contained no mention of any prior surveillance of the area. The only information produced by the affidavit is that police observed Mr. Randle drive to the Vera Cruz Lane residence once after interacting with the informant.

This information was the sum total of the evidence presented to the state court judge, and a search warrant for the Vera Cruz Lane home was signed. Shortly after that, police executed the warrant and seized numerous items from the home. Mr. Randle was arrested

during the search of the home. Warrants granting the search of Mr. Randle's person and his silver 2008 Audi Q7 Sports Utility Vehicle were also executed at that time.[1]

The express purpose of the Fourth Amendment is to secure the "houses, papers, and effects of this nation's citizens from governmental intrusion." U.S. Const. amend. IV. Its protective force is strongest at the private home's doorstep. *Kyllo v. United States,* 533 U.S. 27, 31 (2001). Thus, any police officer seeking to invade a private home must first obtain a valid search warrant upon showing probable cause to the satisfaction of a neutral magistrate. *Groh v. Ramirez,* 540 U.S. 551, 559-60 (2004). "When a magistrate relies solely on an affidavit to issue the warrant, only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." *United States v. Farlee,* 757 F.3d 810, 819 (8th Cir. 2014) (citation and internal punctuation omitted). Probable cause means that, given all the circumstances set forth in the affidavit, there exists sufficient information to conclude that "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 238 (1983). The warrant affidavit at issue here failed to make the requisite probable cause presentation, and thus the fruits of the illegal search must be suppressed.

The overwhelming defect with the warrant affidavit in this case is its failure to draw the requisite link between the probable-cause presentation set forth in the warrant affidavit and the particular location selected for police invasion. *Gates,* 462 U.S. at 238. This is often

---

[1] The same warrant affidavit was rejected for failing to establish nexus in the co-defendant's case in Hennepin County District Court. *See* Order, June 4, 2019, *State v. Elmore*, Case No. 27-CR-19-2841, *notice of appeal filed* June 10, 2019 (App. Case No. A19-892).

referred to as the "nexus" requirement, *e.g., United States v. Skarda,* 845 F.3d 370 (8th Cir. 2016) (quotation marks omitted) (quoting *United States v. Tellez,* 217 F.3d 547, 550 (8th Cir. 2000)), and the Fourth Amendment demands it to ensure the police narrowly tailor any invasion to the probable-cause showing set forth in the warrant affidavit and never beyond, *e.g., Ybarra v. Illinois,* 444 U.S. 85, 91 (1979). As relevant in this case, the key rule is that:

> Probable cause to search a person's residence does not arise based solely upon   probable cause that the person is guilty of a crime. ***Instead, there must be additional evidence linking the person's home to the suspected criminal activity.***

*United States v. Roach,* 582 F.3d 1192, 1202 (10th Cir. 2009) (citations and punctuation omitted); *accord, e.g., United States v. Frangenberg,* 15 F.3d 100, 102 (8th Cir. 1994) (probable-cause presentation insufficient where warrant affidavit only noted an individual possessed a prescription bottle containing a small amount of illegal drugs and failed to draw connection to "place to be searched"); *see also, e.g., United States v. Hogan,* 25 F.3d 690, 692-93 (8th Cir. 1994) (warrant affidavit supplied sufficient information of illegal drug sales activity to justify search of individual's home and pickup truck, but not the automobile seized by police).

In this case, the affidavit supplies a cursory and temporally unclear explanation as to why the police suspected Mr. Randle of participating in an illegal drug sales operation. However, it fails to supply the requisite "additional evidence linking the person's home to the suspected criminal activity." *Roach,* 582 F.3d at 1202. Instead, even viewing the allegations in favor of the affiant's facts, the affidavit only says that the home on Vera Cruz Lane is "listed" as Mr. Randle's reported address. At most, that information ties Mr. Randle

weakly to the home, but does not tie his alleged drug activity to the home. As noted above, the CRI met with Mr. Randle at an unspecified place away from the Vera Cruz Lane home. If the interaction between Mr. Randle and the CRI took place at the home, the affiant undoubtedly would have included such information in the affidavit. Simply put, the police did not even attempt to show the judge that Mr. Randle had or stored drugs at the Vera Cruz Lane address.

The nexus requirement makes clear that the warrant application must show that evidence of a crime is likely to be found in a person's home, not just that police suspect a person of a crime. *See United States v. Rios-Uscanga,* No. 16-CR-316-RHK-KMM, 2017 WL 1534746, at *4 (D. Minn. Mar. 13, 2017), *report and recommendation adopted,* CR-16-316(1) RHK-KMM, 2017 WL 1534745 (D. Minn. Apr. 26, 2017) (warrant failed to establish adequate nexus by showing no tie between the house and a defendant's illicit activities). "[I]t cannot follow in all cases, simply from the existence of probable cause to believe a suspect guilty, that there is also probable cause to search his residence." *United States v. Lucarz,* 430 F.2d 1051, 1055 (9th Cir. 1970); *see also States v. Helton,* 314 F.3d 812, 821 (6th Cir. 2003) (where investigation revealed a defendant was closely connected to possession of narcotics, a search warrant for his home was invalid without any reliable evidence linking that residence to the drug trade); *United States v. Frazier,* 423 F.3d 526, 532 (6th Cir. 2005) ("The critical element in a reasonable search is not that the owner of property is suspected of a crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought.") (quoting *Zurcher v. Stanford Daily,* 436 U.S. 547, 556 (1978). In other words, just because

a person is suspected of a crime does not give police the authority to search that person's home.

In this case, the probable-cause/nexus presentation was wholly insufficient to justify a police search of the Vera Cruz Lane home. The affidavit contained no showing that Mr. Randle completed a drug sale at the home, stored drugs there, or had any anything else associated with a drug operation there. Case law is instructive in providing examples of how police can properly tie a person's illegal conduct to that person's home, justifying a valid search. For example, police often claim that criminal activity actually occurred at the place to be searched. *See, e.g., United States v. Adams,* 401 F.3d 886, 893 (8th Cir 2005) (probable cause justified warrant where defendant engaged in drug activity at his house, which was established by earlier electronic surveillance intercepting conversations from a telephone number assigned to that house). However, this well-established mode of making the requisite nexus showing was neither made nor even attempted.

Accordingly, the warrant affidavit arguably may show probable cause that a particular person has committed an offense (perhaps permitting arrest and search of that person), but it undoubtedly fails to demonstrate the requisite probable cause to invade the person's home (rendering such search and seizure unlawful). *See*, *e.g.*, *Frangenberg,* 15 F.3d at 102; *Frazier,* 423 F.3d at 533 ("[T]he allegation that the defendant is a drug dealer, without more, is insufficient to tie the alleged criminal activity to the defendant's residence."). In sum, the warrant affidavit contained a facially insufficient probable-cause/nexus presentation. Probable cause was lacking here, and the resulting search, seizure, and fruits must be suppressed.

**B. The affidavit is not entitled to the presumption of good faith.**

The search here cannot be saved by the good-faith exception to the exclusionary rule articulated in *United States v. Leon,* 468 U.S. 897, 919–20 (1984). In *Leon,* the Supreme Court held that a search pursuant to an erroneously issued warrant may be upheld in some instances, *but only so long as the police so rely on the warrant in objective good faith. Id.* at 920. In this context, "good faith" clearly means a *lawful* effort by police to comply with the Fourth Amendment's strictures and intent. *Id.* In other words, a police invasion—even if permitted by a warrant's express terms—will result in suppression when the warrant affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable . . . or when the warrant [is] so facially deficient . . . that the executing officer cannot reasonably presume it to be valid." *Id* at 923.

Put differently, the *Leon* good-faith exception asks "whether a reasonably well-trained officer would have known that the search was illegal despite the issuing judge's authorization." *United States v. Houston,* 665 F.3d 991, 995 (8th Cir. 2012) (citations and internal punctuation omitted). Under that standard, *Leon* will not save a warrant where a well-trained officer "would have known that his affidavit failed to establish probable cause and that he should not have applied for a warrant." *Malley v. Briggs,* 475 U.S. 335, 345 (1986). Moreover, it will not save a facially invalid warrant, particularly where the executing officer was also the drafter. *Ramirez,* 540 U.S. at 563-564.

The exclusionary rule is designed to deter police conduct that violates the constitutional rights of citizens. *Leon,* 468 U.S. at 919. "The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent,

conduct which has deprived the defendant of some right." *United States v. Peltier,* 422 U.S. 531, 539 (1975) (quoting *Michigan v. Tucker,* 417 U.S. 433, 447 (1974)). *Leon* aims to balances the exclusionary rule with the interest of promoting warrant applications over warrantless searches. 468 U.S. at 919-21.

In this case, *Leon* cannot save the search because, "[w]ithout any nexus between the criminal activity and the residence, reliance upon this warrant would be completely unreliable and would place it beyond the good faith exception." *United States v. Kemper,* 375 F. Supp. 2d 551, 554 (E.D. Ky. 2005) (in a murder case, stale information did not support probable cause and the good faith exception to the exclusionary rule was not applicable). Further, when an "affidavit[] simply do[es] not say very much about [the defendant] or his residence," officers cannot reasonably rely on the issuing judge's probable cause determination. *United States v. Herron,* 215 F.3d 812, 814 (8th Cir. 2000).

In *Herron,* a search warrant was issued for Herron's residence, following his alleged involvement in a relative's marijuana growing operation. While the supporting affidavits included his prior marijuana convictions and his family relationship to the marijuana growers, "the affidavits [made] only two passing references to the Herron residence" and only three references to Herron. *Id.* at 815. In determining that suppression was warranted in spite of the good faith exception, the Eighth Circuit ruled that "the lack of probable cause in the affidavits would have been apparent to reasonable officers." *Id.* The clear lack of probable cause in this case is so obvious that any reasonable officer could plainly see it on the face of the warrant.

Courts have sometimes invoked the *Leon* rule in cases involving a deficient probable-cause/nexus presentation. In those cases, however, there must exist "some modicum of evidence, however slight, to connect the criminal activity described in the affidavit to the place to be searched." *Id.* at 749. By contrast, the *Leon* rule cannot revive a search and seizure where the four corners of the warrant affidavit do not provide any evidence connecting suspected criminal activity to the place to be searched. *Id.* at 751-52. This case presents the latter situation, and for this reason the *Leon* rule cannot be invoked to revive the unlawful search and seizure at issue here. *See id.*

On four-corners review of the affidavit supporting the three search warrants here, there was a lack of probable cause so glaring that any reasonable officer would have known that it was not constitutionally justified. The affidavit is not entitled to the presumption of good faith, and Mr. Randle respectfully asks this Court to suppress all evidence deriving from the execution of those illegal warrants. This includes but is not limited to all evidence found during the execution of the search warrant on Mr. Randle's person, *see* Govt. Ex. 2, 4, all evidence found inside the Vera Cruz address, and the custodial statement made by Mr. Randle.

**II.  A *FRANKS* HEARING IS NECESSARY TO INQUIRE INTO THE MISREPRESENTATIONS OF MATERIAL FACT MADE IN THE SEARCH WARRANT AFFIDAVIT. PRIOR TO THE HEARING, THE GOVERNMENT SHOULD BE ORDERED TO PROVIDE SUPPLEMENTAL DISCOVERY AS REQUESTED BY THE DEFENSE.**

In *Franks v. Delaware*, 438 U.S. 154 (1978), the Supreme Court considered whether a reviewing court could, under certain circumstances, delve into the contents of an affidavit

presented in support of a search warrant to examine its veracity. The Court ultimately decided that such an examination was permitted under certain circumstances. Although the Court made clear that a "presumption of validity" applied to an affidavit submitted in support of a warrant, that presumption is not insurmountable. *Franks*, 438 U.S. at 171.

In order to obtain a hearing in which a reviewing court will look beyond the four corners of the affidavit to examine its truthfulness, a defendant must meet three requirements. First, the defendant must make a substantial preliminary showing that the affiant knowingly and intentionally, or with reckless disregard for the truth, made a false statement in the warrant affidavit. False statements include omissions of material fact if "police omitted the information with the intent to make, or in reckless disregard of whether they made, the affidavit misleading." *United States v. Jacobs*, 986 F.2d 1231, 1234 (8th Cir. 1993). Second, these allegations must be accompanied by an offer of proof, including affidavits or sworn or otherwise reliable evidence. Third, the defendant must establish that the allegedly false statement was necessary to the finding of probable cause, or that the material omission "would be clearly critical to the finding of probable cause." *Id.* at 1235. If the defendant clears these three hurdles, the Fourth Amendment requires that a hearing be held at the defendant's request. *Franks,* 438 U.S. at 155, 171.

If a hearing is held, a defendant must show the following to prevail on a *Franks* challenge:

> (1) the affiant officer knowingly and intentionally, or with reckless disregard for the truth, included a false or misleading statement in, or omitted information from, the affidavit in support of the warrant; and

    (2) the affidavit would not establish probable cause if the allegedly false information is ignored or the omitted information is supplemented.

*United States v. Smith*, 715 F.3d 1110, 1118 (8th Cir. 2013) (*quoting United States v. Cowling*, 648 F.3d 690, 695 (8th Cir. 2011)); *see also United States v. Reivich*, 793 F.2d 957, 960 (8th Cir. 1986) (extending *Franks* to deliberate omissions.)

The evidence available, even prior to any *Franks* hearing, shows that the affidavit supporting the three search warrants in this case contains numerous crucial mischaracterizations and omissions of material fact that misled the magistrate into issuing the warrants. This evidence is sufficient to meet the substantial preliminary showing required before a *Franks* hearing may be held.

Some inaccuracies came to light even before the October 29, 2019, hearing. The government submitted a Declaration of Efrem Hamilton, implicitly acknowledging that Off. Hamilton's assertion that he had arrested Mr. Randle on more than one occasion was false. (ECF Doc. 28-2.) Off. Hamilton admitted as much in his testimony at the motions hearing, affirming that the only time that he had arrested Mr. Randle was in 2012, after a controlled buy. (Mtns T. 21–22.) He testified that everything else in the affidavit was true, *see id*. at 22, but that testimony did not turn out to be accurate.

Off. Hamilton, in his declaration and in his testimony, sought to support the affidavit's allegation of multiple "undercover buys"—in addition to the one that led to Mr. Randle's arrest in 2012—by claiming that, on October 18, 2018, Off. Hamilton was working undercover when he bought crack cocaine from Mr. Randle. As support for this claim, the government submitted a Minneapolis Police Department report from Off. Paul Huynh.

(ECF Doc. 28-3.) That report lists neither Off. Hamilton's name nor Mr. Randle's, but simply appears to document the recovery of crack cocaine during an undercover buy. The document lists the address where this occurred as 421 Broadway Avenue West in Minneapolis, and the "Occurred On" date is listed as "OCT-18-2018 (THU.) 1153."

Mr. Randle has offered two affidavits attesting that he had no part of this 2018 undercover buy. First, there was an affidavit sworn by Denise Evans. (*See* ECF Doc. 71, Ex. 1.) As she explains, Ms. Evans owns Busy Bee, a delivery company, and she employed Mr. Randle as a driver for a time period including the date of the alleged undercover buy. Her company's records show that Mr. Randle was working as a driver on Oct. 18, 2018, making numerous stops for pickups and deliveries. Specifically, her records show that Mr. Randle was preparing a delivery at a warehouse in Mendota Heights at 1153, the time listed in the report submitted by Off. Hamilton.

Second, Mr. Randle has also sworn an affidavit affirming that he had no part of this alleged buy on October 18, 2018. (ECF Doc. 71, Ex. 2.) Mr. Randle acknowledges the undercover buy and arrest from 2012, but he has not had any drug transactions with Off. Hamilton at any other time. (*See* Ex. 2.)

Moreover, the facts do not add up. Off. Hamilton conducted a controlled buy with Mr. Randle and then arrested him in 2012. Why would Off. Hamilton do the same thing again with the same defendant, risking detection? Why would Mr. Randle engage in a transaction with an officer who had already arrested him? Off. Hamilton insisted that Mr. Randle wouldn't remember him, but he could offer no explanation for why. (Mtns T. at 49.) This

strains credulity. The alleged October 2018 crack cocaine did not occur, or if it did, it did not involve Mr. Randle.

Off. Hamilton significantly and intentionally overstated his relationship with and knowledge of Mr. Randle in his warrant affidavit. One undercover buy led to one arrest in the same incident, and Off. Hamilton neglected to add the significant fact that the buy/arrest was in 2012—more than six years prior to Off. Hamilton's affidavit. Rather than acknowledging the age of this prior incident, Off. Hamilton chose to expand this one six-year-old buy/arrest into multiple "arrests" and multiple "undercover crack cocaine buys."

But this was not the only false statement Off. Hamilton had to acknowledge he put in the warrant affidavit. In that affidavit, Off. Hamilton twice mentions checking DVS records, first when checking the Audi's registration and then confirming the status of Mr. Randle's driver's license. But that information did not match Off. Hamilton's pre-conceptions, and so he didn't include it in the affidavit.

Off. Hamilton's testimony regarding Mr. Randle's address was alarming. First of all, he had to agree on cross that his affidavit misstated Mr. Randle's connection to the Vera Cruz house. Where the affidavit said, "RANDLE has 99** Vera Cruz Lane Brooklyn Park, MN listed as his reported address until 03/08/2021," Off. Hamilton had to admit that this was inaccurate, because the March 2021 date was how long Mr. Randle was on supervised release, not how long Mr. Randle was going to be living at the Vera Cruz address. (T. 56–57.) As Off. Hamilton admitted, even while on supervised release Mr. Randle "could move" or "change that address whenever he felt like it." (*Id.* at 57.)

Off. Hamilton could not answer basic questions about the information from U.S. Probation. He could not remember on cross-examination whether he looked it up on a computer or spoke to a person on the phone.[2] (*See id*. at 54.) He could not remember whether he got the information before or after he allegedly followed Mr. Randle back to the house on Vera Cruz. (*See id*. at 88.)

Moreover, however he got the information, Off. Hamilton testified he could not remember if the information he received from U.S. Probation told him that the Vera Cruz address was current as of January 2019 when he was seeking the warrant. (*See id*.) But without any information about how current the address was or how often that information was updated, he had no way of knowing its reliability.

Off. Hamilton checked other records and determined that Mr. Randle had another possible address on Stevens Avenue in Minneapolis, a fact he did not disclose in his affidavit. He testified that he checked DVS records for Mr. Randle's state identification. (*See id*. at 58.) That identification showed that Mr. Randle's address was on Stevens Avenue, which Off. Hamilton admitted he had known at the time he completed the affidavit. (*See id*. at 62.)

Despite having evidence of multiple addresses, Off. Hamilton admitted he did no investigation to determine whether the Vera Cruz address was where Mr. Randle was living. He admitted knowing it would be important to straighten out which address was correct when submitting a warrant affidavit. (*See id*. at 59–60.) He admitted that one way

---

[2] Oddly, his confusion vanished on re-direct, where he claimed without hesitation that he'd gotten the information online. (*See id*. at 87.)

of straightening out the address would have been to talk to a leasing agent, which he had done in other investigations but did not do here. (*See id*. at 75.) When presented with a lease agreement that did not list Mr. Randle as a tenant at the Vera Cruz address, Off. Hamilton did not recognize it because he had never bothered to check who was actually living at the Vera Cruz address. (*See id*. at 75–76; Def. Ex. 2.)

Before drafting his warrant affidavit, there was very little evidence tying Mr. Randle to the Vera Cruz address. Somehow Off. Randle got information from U.S. Probation listing that address, with no way to know if that information was current, but he also had conflicting evidence from Minnesota DVS records that he chose not to disclose in his warrant affidavit. Off. Hamilton ignored all of these reasons to doubt that Mr. Randle was living at the Vera Cruz address and misled the magistrate by presenting the Vera Cruz address without reservation as Mr. Randle's "home," when he was aware of important reasons to doubt that it was.

Rather than presenting the conflicting evidence and allowing the magistrate to decide, Off. Hamilton himself decided that the Stevens Avenue address was irrelevant to the magistrate's decision because Off. Hamilton "didn't place him at that address." (*Id*. at 83–84.)

But Off. Hamilton's investigation only just barely placed him at Vera Cruz, a fact also not revealed to the magistrate. According to the affidavit, officers followed Mr. Randle from a controlled buy "to his home located at **** Vera Cruz Lane." (Govt. Ex. 1 at 3.) Even on its own terms, the statement fails to say anything about seeing Mr. Randle carry anything into the house that might suggest it was connected with drug dealing. But more

16

egregiously, Off. Hamilton neglected to inform the magistrate that, because officers called off their investigation soon after Mr. Randle went inside, they could tie Mr. Randle to that address for no more than 30 minutes. (*See* Mtns T. at 86.)

State vehicle and identification records showed Mr. Randle's address as Stevens Avenue. Off. Hamilton did not tell the magistrate that Mr. Randle about the Stevens Avenue address, but instead only listed the address on Vera Cruz, and furthermore described that address to the magistrate as Randle's "home." This was a gross misstatement of the facts.

The failure to note the conflicting address information highlights the lack of clarity about how Off. Hamilton established the Vera Cruz address as Mr. Randle's. Off. Hamilton stated that "RANDLE has 99** Vera Cruz Lane Brooklyn Park MN listed as his reported address until 03/08/2021." But listed where? Because that sentence follows immediately after a sentence saying that Mr. Randle was on supervised release, the implication is that somehow that information came from U.S. Probation, but the vagueness of the language makes it unclear. This lack of clarity might not matter if there were no other possible addresses besides Vera Cruz, but Off. Hamilton knew—having checked DVS records— that the Stevens Avenue address might be Mr. Randle's actual address. By omitting the Stevens Avenue address and leaving vague where the other address was "listed," Off. Hamilton was able to sidestep essential questions about Mr. Randle's ties to the Vera Cruz address.

In determining if "an affiant's statements were made with reckless disregard for the truth," the test "is whether, after viewing all the evidence, the affiant must have entertained

serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *United States v. McIntyre*, 646 F.3d 1107, 1114 (8th Cir. 2011) (citing *United States v. Butler*, 594 F.3d 955, 961 (8th Cir.2010)). Here, Off. Hamilton was not relying on information obtained from another officer or a separate source of information; whether he bought crack cocaine and arrested Mr. Randle on more than one occasion is information about which he has direct, first-hand knowledge. Likewise, Off. Hamilton admitted that he checked DVS records and knew that Mr. Randle's address was listed in multiple places as Stevens Avenue, not Vera Cruz. Any inaccuracy regarding these statements was a matter over which Off. Hamilton had complete control.

The next step in the *Franks* analysis requires the Court to consider whether the warrant affidavit would demonstrate the necessary probable cause after removing its deliberate or reckless falsehoods and adding the omitted information. Probable cause is "a fluid concept turning on the assessment of probabilities in particular factual concepts" and as such is "not readily, or even usefully, reduced to a neat set of rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983); *see also Ornealas v. United States*, 517 U.S. 690, 697 (1996). To determine whether probable cause exists to support a search warrant, we must look at the "totality of the circumstances." *Id.*

Here, we have to make the following changes to the affidavit to make it accurate:

- Replace "Your affiant has had many interactions with RANDLE including arrests and undercover crack cocaine buys from RANDLE" with "Off. Hamilton arrested Mr. Randle once after an undercover buy in 2012."

- Change "RANDLE has 99** Vera Cruz Lane Brooklyn Park, MN listed as his reported address until 03/08/2021" to "RANDLE has 99** Vera Cruz Lane Brooklyn Park, MN listed as an address with U.S. Probation. RANDLE is on federal supervised release until 03/08/2021."

- Add "DVS vehicle and state identification records show that RANDLE's address is 19** Stevens Avenue South, Minneapolis, MN. Your affiant believes the Vera Cruz address is RANDLE's home is at 99** Vera Cruz Lane because he was seen entering that house once and was still there 30 minutes later when officers left."

- Change this sentence as marked: "Your Affiant and assisting Officers followed RANDLE as he drove from the City of Minneapolis to a house located at 99** Vera Cruz Lane, Brooklyn Park, MN."

After correcting the misstatements in the affidavit, it fails to establish probable cause for the requested searches. A single six-year-old contact is insufficient to prove probable cause when the issue of the identity of the alleged seller of crack cocaine was not otherwise sufficiently established in the search warrant affidavit. Off. Hamilton mentions unspecified "various investigative techniques" in support of his belief that the crack cocaine seller is named Johntez Randle. Although an alleged "confidential reliable informant" was employed to purchase crack cocaine, that CRI never identifies Mr. Randle by legal name, nickname, or phone number, or address. The affidavit includes no information from the CRI about Mr. Randle's appearance or other unique identifying information. Indeed, from the text of the affidavit, the only identifying information provided by the CRI to the Affiant is that "a male is selling crack cocaine in and around the city of Minneapolis MN."

19

Although Off. Hamilton says the CRI identified a picture of Mr. Randle, the affidavit implies the identification procedure was a single-photo show-up, as opposed to a sequentially-presented photo lineup. Single-photo show-ups are often employed in an unreasonably suggestive manner.

Beyond the affidavit's problems with basic identifying information for the alleged crack cocaine seller, the remainder of the search warrant affidavit fails to meet probable cause. The lack of information about the alleged sale to the CRI leaves serious questions about its sufficiency to support a belief that contraband would be located in any of the places to be searched. The affidavit fails to mention anything about where the CRI made the claimed purchase – there is a vague suggestion that it occurred in Minneapolis – or when "within the past 72 hours," the purchase occurred. The affidavit does not tell us how much cocaine the CRI allegedly bought. Further, the affidavit makes a conclusory link between Mr. Randle and the address to be searched – it is "listed as his reported address." Other commonly-used law enforcement techniques used to demonstrate the reliability of the alleged sale to the CRI are not present in the affidavit. The affidavit does not indicate that there was any surveillance equipment – audio or video – used by the informant or surveillance officers. Another common investigative technique is to record any phone contact between the CRI and a drug dealer. Presumably, there should have been telephone contact (or preserved text messages) between Mr. Randle and the CRI before the alleged sale. But the affidavit mentions nothing of a recording, and does not even suggest that a phone call or text messages took place.

The main weakness in the search warrant affidavit—which is fatal even before consideration of Off. Hamilton's mischaracterizations and omissions—is its attempt to draw a nexus between one alleged controlled buy and the address on Vera Cruz. One way Off. Hamilton did that was by overstating his own personal history with Mr. Randle. But Off. Hamilton could only tell the magistrate that the Vera Cruz address was Mr. Randle's "home" by ignoring the DVS records which he testified that he checked, listing an address on Stevens Avenue as Mr. Randle's home under the Audi registration and under Mr. Randle's limited license and state ID. Knowing that there are multiple addresses raises important questions about which address was more reliable, about the source and reliability of each address, and which address was actually Mr. Randle's residence. Off. Hamilton "had obvious reasons to doubt the accuracy of the information he reported." *McIntyre*, 646 F.3d at 1114.

Mr. Randle has made the necessary substantial preliminary showing that Off. Hamilton deliberately or recklessly mischaracterized material facts in his affidavit, and that without those mischaracterizations the affidavit would not have established probable cause. He respectfully asks the Court to schedule a *Franks* hearing at its convenience.

Mr. Randle also notes, as part of the *Franks* argument, that he has moved the Court for additional discovery that is related to this inquiry. (*See* ECF Doc. 39, 66.) Specifically, in these two motions, Mr. Randle requested an order requiring the government to disclose the following regarding the alleged October 2018 and January 2019 controlled buys:

1.  Police reports regarding the controlled buy;
2.  Recordings of audio or video surveillance of alleged controlled buy;
3.  Date and time of the controlled buy;

4. Specific location of the controlled buy;
5. Description of any suspect vehicles involved in the controlled buy;
6. Records regarding the buy funds used during the controlled buy;
7. Phone number Mr. Randle was alleged to have used to arrange the controlled buy;
8. Any evidence that controlled buy funds were later located by police;
9. Any laboratory reports regarding testing of drugs purchased in the controlled buy;
10. Any documents demonstrating chain of custody of drugs purchased in the controlled buy;
11. Names of officers who conducted surveillance of Mr. Randle after the alleged controlled buy; and
12. All CRI logs from the alleged controlled buy.

This evidence related to the alleged controlled buys in October 2018 and late January 2019 is crucial to Mr. Randle's argument that he should be granted a *Franks* hearing and to the development of effective cross-examination and impeachment. To the extent that the government has information tending to cast doubt on or contradict the information set forth in Hamilton's search warrant affidavits, that information must be produced. The due process requirements of the Fifth Amendment mandate the disclosure of evidence that is material to Mr. Randle's defense, including material that is relevant to witness credibility and impeachment.

For the alleged January 2019 controlled buy, it is worth noting that no buy money was recovered, in the Vera Cruz address, on Mr. Randle's person, or anywhere else. (Mtns T. at 89–90.) Given that, and given Off. Hamilton's established lack of credibility, information related to the alleged January controlled buy is necessary to Mr. Randle's defense.

If the Court concludes that it is not proper to disclose the sought evidence to Mr. Randle, he argues in the alternative that the government should be ordered to submit it to the Court for in camera review, and that the Court then determine if the evidence should be disclosed to Mr. Randle.

The discovery that Mr. Randle seeks will show the scope of Off. Hamilton's misrepresentations to the magistrate. Off. Hamilton has shown that his credibility is sorely lacking, and so it is relevant and indeed essential to have prior to the *Franks* hearing.

Dated: November 26, 2019     Respectfully submitted,

<u>S/Thomas H. Shiah</u>
Thomas H. Shiah #100365
331 Second Ave South, Ste 705
Minneapolis, Minnesota 55401
(612) 338-0066

Attorney for Defendant