**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**
**Criminal No. 19-50 (ADM/TNL)**

_____

United States of America,

                              Plaintiff,

vs.                                                         **DEFENDANT'S POSITION**
                                                    **WITH RESPECT TO SENTENCING**
                                                      **AND REQUEST FOR VARIANCE**
Johntez Leondis Randle,

                              Defendant.

_____


        This memorandum is submitted on behalf of Defendant Johntez Leondis Randle in connection with his sentencing before the Honorable Ann D. Montgomery. Mr. Randle is asking the Court to sentence him to the mandatory minimum term of 60 months, with concurrent sentencing on his supervised release violation. This sentencing memorandum will first address the Guideline calculations for the offense, and then it will articulate the basis for Mr. Randle's request for a downward variance from the advisory sentencing range and why such a sentence is consistent with the provisions of 18 U.S.C. § 3553(a).

        Mr. Randle has accepted responsibility for his actions and entered his guilty plea, avoiding the necessity of a trial. Mr. Randle acknowledges that the base offense level and the advisory guideline range set out in the PSR is correct. However, that base offense level is based on higher offense levels imposed for crack cocaine. Mr. Randle maintains that there should be no sentencing disparity between crack cocaine and powder cocaine, because that disparity is both unjustifiable and discriminatory. Accordingly, Mr. Randle requests a downward variance based on that disparity.

Other factors justify a downward variance under 18 U.S.C. § 3553(a) as well. Mr. Randle's unique circumstances, including his upbringing and mental health, justify a variance, as does the extraordinarily harsh conditions he has endured during his two years in confinement at the Sherburne County Jail. Taken together, these factors suggest that a sentence of 60 months, concurrent with his supervised release violation, would be sufficient, but not greater than necessary, to serve the statutory goals of sentencing.

**Guideline Calculation**

Mr. Randle asks the Court to vary downward based on the lack of any reasonable basis for enhanced punishment for crack cocaine over powder. There is no just or rational reason why Mr. Randle's sentencing range should more than double simply because the cocaine here was recovered as crack rather than powder. He respectfully asks this Court to vary downward to remove this unjust enhancement and employ a 1:1 crack-powder ratio to correct for the unjust enhancement.

The crack-powder disparity has a long and troubled history. Once *Booker* gave district courts greater freedom to deviate from the guidelines when appropriate, the rationales for the existing 100:1 disparity came under careful scrutiny. Even before *Booker*, the Sentencing Commission itself had released reports questioning the fairness of the disparity and urging Congress to reduce or eliminate it. In *United States v. Kimbrough*, 552 U.S. 85, 110 (2007), the Supreme Court upheld the right of sentencing courts to deviate from the Sentencing Guidelines based on policy disagreements with how crack was punished, "even in a mine-run case."

Mr. Randle's current guideline range is established based on 309 grams (just under 13.5 ounces) of cocaine, which because it was in crack form makes his base offense level

30. To reach level 30 with cocaine in powder form, Mr. Randle would have had to possess at least 5 kilograms, or more than 11 pounds of cocaine. And if those 309 grams of cocaine he possessed were in powder form rather than crack, Mr. Randle's base offense level would be 20, or ten full levels lower. With everything else the same, his sentencing range for that amount of powder would be 37–46 months, increased to 60 months here because of the mandatory minimum. But because the cocaine was found in crack form, the range becomes 100–125 months.

The disparity of treatment between crack and powder cocaine has been reduced from what it once was, but there is no basis for any disparity. The disparity was an outgrowth of fears that have since been disproved. In passing the Anti-Drug Abuse Act of 1986, which established a 100-1 ratio between crack and powder, Congress "bypassed much of its usual deliberative process" and acted quickly in reaction to a number of well-publicized tragedies. U.S. Sentencing Comm'n, Report to the Congress: Cocaine and Federal Sentencing Policy 5 (2002) [2002 Report].[1] Remarkably, the process was conducted with such haste that the "legislative history contains 'no discussion of the 100:1 ratio.'" *United States v. Robinson,* 542 F.3d 1045, 1047 (5th Cir. 2008) (citing William Spade, Jr., *Beyond the 100:1 Ratio: Towards a Rational Cocaine Sentencing Policy*, 38 ARIZ.L.REV. 1233, 1252 (1996)); *see* also 2002 Report at 7 (noting the lack of "authoritative legislative history that explains Congress's rationale for selecting the 100-to-1 ratio" and adding that Congress at various points considered ratios of 50:1 and 20:1). The Fifth Circuit could only conclude that the 100:1 ratio had been chosen largely because an early draft contained a

---

[1] Available at https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/drug-topics/200205-rtc-cocaine-sentencing-policy/200205_Cocaine_and_Federal_Sentencing_Policy.pdf (last visited Jan. 22, 2021).

50:1 ratio, and Congress wanted to "symbolize redoubled Congressional seriousness[.]" *Robinson*, 542 F.3d at 1047 (citations omitted).

But the fears, as codified in law, weren't rational. The most prominent of the tragedies driving Congress to act, the death of star basketball player Len Bias on the night the Boston Celtics drafted him second overall in the 1986 NBA draft, was popularly blamed on crack cocaine, but he had actually overdosed on powder cocaine. Michael Weinreb,

*The Day Innocence Died,* ESPN*, available at*

http://www.espn.com/espn/eticket/story?page=bias (last visited Jan. 22, 2021). In time, though, it would turn out that most of what the public and Congress thought they understood about crack in 1986 was wrong.

As best as the Sentencing Commission could determine, there were five main beliefs that lay behind the 100:1 ratio. These beliefs were: (1) crack's greater addictiveness; (2) crack's greater correlation to serious violent crime; (3) crack's greater physiological dangers, especially to so-called "crack babies" born of addicted mothers; (4) crack's greater appeal to young users; (5) crack's greater general availability and appeal because of its low cost. *See* 2002 Report at 9–10. These beliefs were all at least partially wrong.

The 1986 Act has been subject to constant criticism since it was passed, as the Court is well aware, and Mr. Randle will not rehash them in their entirety here. The 2002 Report contains a lengthy refutation of the beliefs described above, which is reinforced by a follow-up report put out by the Commission five years later. See U.S. Sentencing Commission, Report to the Congress: Cocaine and Federal Sentencing Policy (2007) [2007

Report].[2] Judge Bye wrote a dissent in *United States v. Spears*, 469 F.3d 1166 (8th Cir. 2008), *rev'd* 552 U.S. 1090, explaining at length why district courts should not be bound by the 100:1 ratio established by Congress. And Judge Mark W. Bennett, whose sentence was at issue in *Spears*, has given a reasoned justification for why the crack-powder disparity should be abandoned entirely. *See United States v. Gully*, 619 F. Supp. 633 (N.D. Iowa 2009). Other judges around the country have come to the same conclusion. *See*, *e.g.*, *United States v. Gardner*, 20 F.Supp.3d 468, 470 (S.D.N.Y. 2014) ("A brief review of the relevant background makes clear how little, if any, this disparity has to do with any objective difference between crack and powder cocaine and how much it has to do with the dead hand of history."); *United States v. Whigham*, 754 F.Supp.2d 239, 247 (D.Mass. 2010) (observing that "[c]ritically evaluating the crack/cocaine ratio in terms of its fealty to the purposes of the Sentencing Reform Act is not optional" and "is not something that a judge has discretion to do or not to do," before adopting a 1:1 ratio); *United States v. Lewis*, 623 F.Supp.2d 42 (D.D.C. 2009) (adopting Judge Bennett's reasoning in *Gully* to support using the 1:1 ratio).

All cocaine is addictive, and the means of ingestion has more effect on addictiveness than the form of cocaine ingested. See 2002 Report at 93. The greatest risk of addiction comes from smoking or injecting a drug, so smoking crack is more addictive overall than snorting powder cocaine. But powder can also be injected, and when it is, the addictive potential is approximately equal to smoking crack. But even comparing smoking crack to

---

[2] Available at https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/drug-topics/200705_RtC_Cocaine_Sentencing_Policy.pdf (last visited Jan. 22, 2021).

snorting powder, it is impossible to quantify the difference in addictive potential. *See id*. at 94.

The Sentencing Commission also found that there was only a marginal difference in rates of serious violent crime between those caught with crack versus those with powder. *See id*. at 52–57. The rates of death associated with each were the same. *See id*. at 57. Overall, neither crack nor powder was associated with significant rates of aggravating factors involving weapons or injury. *See id.* at 52.

The supposed "crack baby" epidemic proved to be an illusion. Because the pharmacological effects are the same, researchers stopped even trying to differentiate the effects of crack and powder cocaine on prenatal development. *See* 2007 Report at 69. More importantly, the effects of cocaine proved to be far less disastrous than originally feared. There was an increased risk of premature birth for fetuses exposed to cocaine, but effects on development were limited to subtle differences in attention and impulse control. *See id*. The horrible effects that people once ascribed to crack were more likely to have resulted from the use of alcohol and tobacco or other illicit substances. *See id*. at 69–71.

Nor did the belief that crack was or would become prevalent among youth turn out to be true. Young people's use of crack was remarkably consistent over the years 1991– 2006, with around 1% of 12th graders reporting having used in the past month. *See id*. 72– 73. Notably, the use of crack was about half that of powder cocaine. *See id.*

Overall, crack was always less popular among the general public than powder cocaine, and the expected explosion in usage never arrived. The Sentencing Commission reported that, in every year from 1988 to 1998, crack use among adults remained level, with no more than 686,000 users at any time. *See* 2002 Report at 69.

Taken all together, the evidence calls into doubt every explicit fear that led Congress to create the crack-powder disparity. Judge Bye in *Spears* and Judge Bennett in *Williams* both came to the same conclusion: if there has to be a distinction, the evidence actually supports higher penalties for powder than for crack. *See Spears*, 469 F.3d at 1187 (Bye, J., dissenting) ("If anything, the evidence suggests powder cocaine should be targeted more severely than crack."); *United States v. Williams*, 788 F.Supp.2d 847, 861 (N.D. Iowa 2011) (quoting this passage from *Spears* and noting agreement in a sentencing order finding no basis for the newly-enacted 18-1 ratio other than compromise and using instead a 1:1 ratio).

The one real, significant, and lasting distinction between crack and powder cocaine has been demographic. The overwhelming percentage of those brought into federal court on crack charges are Black. *See* 2007 Report at 15–17 (noting that Black Americans made up 92% of crack defendants in 1992, 85% in 2000, and 82% in 2006). Uniquely among the major types of controlled substances, three-fifths of crack defendants from 1994 to 2012 were sentenced to a decade or more in prison, with an average sentence far above that for powder cocaine or any other drug. *See* Bureau of Justice Statistics, *Drug Offenders in Federal Prison: Estimates of Characteristics Based on Linked Data 6 (2015)*, *available at* www.bjs.gov/content/pub/pdf/dofp12.pdf (last visited Jan. 22, 2021). As of 2015, more than 88% of offenders in prison for crack offenses were Black. *See id.* at 3.

The Sentencing Commission concluded its 2002 Report by noting the "widely-held perception that the current penalty structure promotes unwarranted disparity based on race." 2002 Report at 102–03. "[E]ven the perception of racial disparity" is "problematic," wrote the Commission, because it "fosters disrespect for and lack of confidence in the

criminal justice system[.]" *Id*. at 103. Before recommending that the disparity be reduced, the Commission acknowledged that its own study showed that the "widely-held perception" of unwarranted disparity was based in reality: "[T]o the extent that the preceding analysis has shown that the 100-to-1 drug quantity ratio results in unduly severe penalties for most crack cocaine offenders, the effects of that severity fall primarily upon black offenders." *Id*. Although the 2002 Report is remembered for recommending a 20:1 ratio, the Commission was explicit that a lower ratio might be more just and that it was only setting an outer boundary. *See id*. at 106 (recommending a five-year threshold of "*at least* 25 grams" and a ten-year threshold of "*at least* 250 grams," while also suggesting a 10:1 ratio based on the then-current methamphetamine mixture thresholds).

This variance is also supported by the circumstances of Mr. Randle's case. There is no violence or weapons involved. He simply possessed crack cocaine. He was not a major player and was attempting to supplement his income. The increased penalties for crack over powder treat Mr. Randle as if he held a significant role, but the facts of this case show he was just a street-level dealer. *See Whigham*, 754 F.Supp.2d at 247 (noting that "[t]he Guidelines undervalue just how minor a crack dealer's role is" and that "while crack dealers like Whigham are de facto at the bottom of the drug hierarchy, the Guidelines do not treat them as such").

Here, there are limits to how far the Court can go to recognize this unjust disparity. As mentioned above, a 1:1 ratio here would result in an advisory guideline range of 37–46 months, which is below the mandatory minimum of 60 months. Mr. Randle respectfully asks the Court to vary downward to the mandatory minimum sentence.

## Sentencing Factors

### a. Personal Background

Mr. Randle stands before the Court convicted of a serious crime and he knows that. Nonetheless, he wants the Court to be aware of his background and the circumstances that he was confronted with growing up. Despite his involvement in selling drugs, Mr. Randle is a good person, a good father, and he has many positive assets that clearly indicate he is capable of rehabilitation.

Mr. Randle's association with drugs began in his early upbringing. Mr. Randle did not have the normal life of most kids because his parents were incarcerated through most of his youth. Mr. Randle spent much of that time with his grandparents while his parents were incarcerated. But he was also homeless at times, and he had to do what he felt was necessary in order to stay alive. Mr. Randle never knew how to work a job because no one never taught him how to do those things. Mr. Randle dropped out of school because he did not have a stable household. He found himself staying on the streets all night and sleeping in abandoned homes or in cars because he had nowhere else to go. At times, he had to steal food from grocery stores to eat. He had to fend for himself, and he started selling drugs so he could get food and shelter.

At the age of 11, he moved from Springfield, Illinois, with his father John Randle, and he attended school here. At the age of 13, he started getting involved in selling drugs because the father who brought him to Minnesota struggled deeply with alcoholism and crack cocaine abuse. At that young age, Mr. Randle found himself on a street corner selling marijuana.

Mr. Randle felt obligated to protect his father and care for him while he was struggling with addiction. At the same time, his mother was incarcerated in federal prison., Mr. Randle began using marijuana and drinking alcohol at the age of 14, and soon he started encountering law enforcement. He was placed in and out of juvenile detention centers throughout his early life. At 21, Mr. Randle began using large amounts of cocaine to cope with his pain because doing so made him feel good and allowed him to temporarily escape the problems in his life at that time.

Mr. Randle had nobody to turn to or guide him growing up like other children. He lived in tough neighborhoods in North Minneapolis where he witnessed his friends die by gun violence, including one that died in his arms. The trauma Mr. Randle faced was extraordinary, and he felt at times being in the street that he had to protect himself, which explains why he was arrested in 2006 for possession of a short-barreled shot gun. Mr. Randle's intention was not to use it, but only to protect his household.

This was not the life Mr. Randle wanted for himself. He wanted to be like his icon, Michael Jordan. He used to play basketball all day after school because he wanted to be somebody in life. He did not want to be a drug dealer, and he did not want to be labeled as a criminal or a tough guy. That is not who Mr. Randle is, regardless of his criminal history.

**<u>Mental Health</u>**

Perhaps unsurprisingly given his upbringing, Mr. Randle has experienced mental health issues, including ongoing depression and anxiety. He has struggled with a learning disability and a low IQ. He has experienced mental health issues, and he was even hospitalized for them while growing up. As a result of his learning disability, he was placed on social security and experienced mental health issues relating to ADHD. He also

struggled with personality disorders and significant depression and anxiety. As reflected in the PSR, Mr. Randle has been dealing with mental health issues for quite some time. They have been diagnosed while incarcerated at Sherburne and also before that in Hennepin County.

Through no fault of his own, Mr. Randle has experienced severe depression and anxiety at various stages in his life, and he has sought refuge in both alcohol and drugs as a coping mechanism. While incarcerated at Sherburne, with the normal county jail restrictions heightened by even more restrictive pandemic procedures, his condition has deteriorated. He has been prescribed various medications during the past two years, without much success. In addition to being a consideration for hard time credit, he also wants the Court to consider his mental health in determining an appropriate sentence in this case. Mr. Randle maintains that if he is sentenced to a significant amount of prison time, this will exacerbate his present mental health issues. He recognizes that these issues will be an ongoing struggle, and that he will have to confront them both in and out of prison.

Mr. Randle has experienced an unfair life. He had dreams of growing up like every other kid, but unfortunately that did not happen because of lack of parental supervision. Everything Mr. Randle did was for his survival. He recognizes that he has engaged in some assaultive behavior in the past, which was partially because of his use of alcohol as an attempt to cope with his mental health. His recent history has been free from violence. He has recognized that his alcohol use was a problem, and he has tried to address it.

He participated in RDAP as well as other classes during his last period of incarceration. This was reflected by his successful employment history upon his release. The first week out, Mr. Randle was employed with team personnel and his second job was

for Centimark Roofing, and his third job was working for Busy Bee Services, where by all accounts he was successful and a dedicated employee. (*See* Letter from Ms. Denise Evans (attached as Exhibit A).)

Mr. Randle is personally devastated by his involvement in this offense because his conduct was in direct opposition to the direction his life was going. He relapsed and started using powder cocaine, which has been a struggle throughout his life. He ended up in debt and was trying to catch up on some of his bills. At the time, he was under duress and was having difficulty providing for his children and his household and all of the people he was trying to help. In addition to his children, he wanted to take care of his elderly grandparents and put them in a better situation. He also thought by generating some extra income, he could start a legal business so his family wouldn't have to struggle with drugs. Mr. Randle ended up hanging around some old friends, and he did them a favor by participating in the drug world. He never generated significant income, nor did he buy expensive cars or jewelry. He was simply trying to get ahead.

His intention upon his release from prison was not to get back into the drug trade but instead to work in a legitimate job and provide for his children and family. He is extremely remorseful for those decisions, and he recognizes that he has let himself and his children down once again. In his own words, at times he feels like a loser, wishing that he could take back everything that he has been through in his life to become a normal person and not be labeled as a criminal. He also wishes he could change the mistakes he has made. But he fully accepts responsibility for his actions, and he is prepared to go forward with his life and atone for his mistakes.

Mr. Randle admits that what he did was wrong, and he accepts the consequences for his mistakes. He knows that he cannot keep making excuses for how he was raised to continue to indulge in criminal activity. A five-year sentence would give him the opportunity to correct his mistakes and once again take advantage of RDAP as well as other classes that the BOP has to offer. Such a sentence will also be sufficient punishment for his crime.

As the Court is aware, Mr. Randle has a loving family and several children. He takes pride in being a father and loves his children dearly. He would do anything in the world for them even if that meant dying so they could have a better life. He has tried to provide for them in the best way he knows how and be a hands-on father, so they do not have to experience what he did growing up. He always wanted to give his children a fair opportunity in life, and he took chances and made sacrifices to provide for them. His children are the most important people in his life, and he made a promise to never let them down again.

His current situation has caused Mr. Randle a great amount of pain because he thought he would succeed in life when he got released from prison. The whole time in prison, he was not sitting there thinking about selling drugs, but rather about what he could do to improve himself and to be successful upon his release. While incarcerated, he was recognized as a leader in RDAP, selected to make presentations to the staff and the RDAP community. And he participated fully in RDAP even though he knew he wasn't eligible for the one-year reduction in sentence. Mr. Randle has many positive qualities which can be marshalled to assist in his success and rehabilitation upon his release.

Mr. Randle is not a bad person. He knows where he went wrong and does not need a sentence of ten years to convince him that the path he chose was not correct. In addition, such a lengthy sentence would also have an adverse impact on the mental health problems he has encountered and experienced throughout his life. He understands what it takes to do the right thing and recognizes the folly of trying to get money illegally when times get hard. He acknowledges that he had no business selling drugs and accepts responsibility for those actions.

Mr. Randle is requesting a second chance to rehabilitate himself and take advantage of all that prison has to offer. He is clearly a smart person, wise in life and possessing a great deal of common sense. Although what he went through in his life has been traumatic, he promises that he will make something out of his life and do something constructive for the benefit of his children. Upon his release, he has high hopes and aspirations. He would like to help not only the people he loves but also the people in the community. He feels that because of his own unique experience, he has something to offer and could provide guidance to youth in the community to help them avoid many of the pitfalls he has encountered in his life. Despite all that he has been through, he is determined to make it in life.

**Criminal History**

Mr. Randle is aware that the Court will consider his criminal history as one of the factors in determining the appropriate sentence. He recognizes that on paper, his past record, may give a negative impression. As stated previously, with respect to his firearms conviction, it was born out of a need for protection and not violence. With respect to his drug offenses, they were a result of his attempt to survive.  It is counsel's understanding

14

that Mr. Randle will provide more details regarding his past actions in his own letter to the Court.

**Hard Time**

Mr. Randle also respectfully asks the Court to vary downward because of the extraordinary punishment of having been housed in Sherburne County Jail since February 6, 2019. The BOP will give him credit for approximately two years in custody, and Mr. Randle respectfully asks for the Court to vary downward by an additional two years because the hardships of his time in jail justify 2-days-for-1 credit.

Sherburne County Jail is spartan under the best of conditions. There is limited programming, and no opportunity to go outside. People housed in Sherburne County Jail never see the sun, but they do see the lights in their cells, 24 hours a day. Added to the constant noise of people yelling, singing, and crying, it makes sleep almost impossible.

This past year has been even worse. Mr. Randle's time has fallen during the whole of the pandemic. Due to Covid restrictions, people can't even participate in the limited programming the jail offers. The only exercise they can get is what they can do in their cell. For weeks at a time, people have been kept in their cells 22 hours per day, with just two hours out to use the day room. The conditions are damaging, physically and psychologically. Mr. Randle has experienced significant mental health issues while incarcerated and diagnosed by jail medical staff as suffering from both anxiety and major depression. As noted earlier, he experienced mental health conditions prior to his stay at Sherburne but the conditions there have caused him to reoccur and deteriorate.

The time Mr. Randle has spent in custody over the past two years has been extraordinarily punitive, and he respectfully asks the Court to take these conditions into

account in sentencing. These conditions warrant a downward variance of two years to reflect 2-days-for-1 credit.

**Supervised Release Violation**

Mr. Randle is facing a supervised release violation in Docket No. 14-CR-134. Under 18 U.S.C. § 3583(e)(3), the maximum penalty he faces for violating supervised release on a Class C felony is two years. The Court has discretion to order that any sentence on Mr. Randle's violation run concurrently with his new sentence. *See*, *e.g.*, *United States v. Smith*, --- F.3d ---, No. 19-3528 (8th Cir. Dec. 23, 2020), Slip Op. at 4. The government has not taken a position on the matter.

Running a violation time concurrent is not unusual, even with repeat firearm offenses posing a more imminent public-safety risk than the non-violent crack sales in this offense. In *United States v. Derek Johnson*, Crim. No. 07-92 (PJS), Mr. Johnson violated his supervised release for a firearm offense by failing to remain law abiding. The violation had an advisory guideline range of 21 to 27 months. The Court imposed 21 months to run concurrent with his sentence in Crim. No. 14-130, a new gun case. In *United States v. Michael Brooks Bynum*, Crim. No. 12-172 (SRN), the Court ran Mr. Bynum's violation for his supervision term for possession of a firearm concurrent with this new firearm and robbery convictions. In *United States v. Trudale Williams*, Crim. No. 17-60 (SRN), the violation term for possessing a firearm ran concurrent with the new firearm case.

As shown above, there are good reasons under § 3553 why a sentence of less than 60 months would be appropriate for Mr. Randle's new offense if there were no mandatory minimum, and so he respectfully asks the Court to use those reasons to support a concurrent sentence on the supervised release violation. Merely applying a 1:1 crack-powder ratio, for

example, leads to an advisory sentencing range in this case of 37–46 months, even before considering Mr. Randle's other arguments related to the context of his life, his mental health and chemical dependency issues, and the hard time he has served in his two years at Sherburne County Jail. Although the Court cannot sentence below 60 months, Mr. Randle respectfully asks the Court to run his supervised release sentence concurrent to the present offense because five years is sufficient to punish Mr. Randle for both the new offense and his violation of supervised release.

## CONCLUSION

For all of these reasons, Mr. Randle is respectfully requesting a variance from the advisory guideline range pursuant to 18 U.S.C. §3553. He asks this Court to impose a sentence that would allow him to return to his family as soon as possible and begin a new chapter in his life that does not involve any criminal activity. A sentence of 60 months is more than adequate and reflects the seriousness of the crime, consideration for his own unique circumstances, promotes public safety, and serves as an adequate deterrent.

Dated:  January 22, 2021                    Respectfully submitted,

**LAW OFFICES OF**
**THOMAS H. SHIAH, LTD.**

By      S/Thomas H. Shiah
        Thomas H. Shiah #100365
        331 Second Ave South, Ste 705
        Minneapolis, MN 55401
        (612) 338-0066

        Attorney for Defendant



To whom it may concern:

This letter is to give positive feedback on the performance of Johntez Randle.

Mr. Randle is a person that has in the past, always helped to accommodate the needs of Busy Bee and its customers. He was valued and appreciated here as a contributor to the well being of our stake holders.

We here at Busy Bee needed people like Johntez that will go above and beyond many of our other contractors, he did not complain, and did a great job servicing our customers when he was able to work.

Johntez worked very well with the other drivers and warehouse personnel.  His positive attitude and cheerful disposition created an enjoyable work environment.  He was exceptionally reliable; we could always count on him to get the job done right.

It is my opinion that Johntez just needs to be given a chance.

If you need any further information, please do not hesitate to call.

Thank you,

Denise Evans

Operations Manager

Office: 651-373-1332

**EXHIBIT A**